2002 OK CIV APP 15

Danny K. DAHL, Plaintiff/Appellee,

v.

STATE of Oklahoma, ex rel., DEPARTMENT OF PUBLIC SAFETY, Defendant/Appellant.

No. 96,338.

Court of Civil Appeals of Oklahoma, Division No. 2.

Dec. 26, 2001.

Jose Gonzalez, Purcell, OK, for Plaintiff/Appellee.

J. Robert Blakeburn, Oklahoma Department of Public Safety, Oklahoma City, OK, for Defendant/Appellant.

TOM COLBERT, Judge:

¶ 1 The Department of Public Safety (State) appeals an order of the trial court setting aside the revocation of Danny K. Dahl's driver's license. The issue on appeal is whether the trial court erred in finding that there was no valid arrest. Upon reviewing the record and applicable law, we hold that the trial court did err and reverse its decision.

## BACKGROUND

¶ 2 On June 28, 1999, a reporting person made a call to the Oklahoma Highway Patrol (OHP), reporting that the driver of a truck was harassing the caller. The OHP dispatcher notified Trooper Dennis Dickens, who, in turn, notified the police dispatcher in Purcell, Oklahoma. Officer Rodney Tompkins was on routine patrol in Purcell when his dispatcher informed him of the driver that was harassing other drivers. The vehicle was reported to be northbound on I–35, approaching the city limits of Purcell. Officer Tompkins went to the 91 mile marker of I–35 and waited, but he did not see the vehicle, described as a red Chevy extended-cab pickup, travel past the 91–mile–marker. He then traveled north on I–35.

¶ 3 Officer Tompkins later testified that, at approximately the 94–mile–marker, he caught up with a red extended-cab pickup and that the "vehicle was left of center, right of center, it was all over the roadway." He then contacted his dispatcher and said he was going out of the city limits at approximately the 94–mile–marker, but that he had observed the vehicle. After he spotted the truck, Officer Tompkins made direct contact with Trooper Dickens of the OHP. Officer Tompkins stated that Trooper Dickens told him over the radio that, "if I have probable cause to stop the vehicle or if it's driving in a manner that I feel it needs to be stopped, go ahead and shut it down and he'd be there as soon as he could." Acting upon Trooper Dickens' direction, Officer Tompkins then stopped the vehicle at approximately the 98–mile–marker and told Dahl he was being stopped "for the Highway Patrol, that they needed to talk to him, he was all over the road, and I went ahead and stopped him and the Highway Patrol would be here in a minute and would talk to him."

¶ 4 Trooper Dickens' testimony closely resembled Officer Tompkins'. Trooper Dickens stated that he was dispatched to investigate a report of a reckless driver. The reporting person informed him that the reckless driver was at the 91–mile–marker. He then contacted the Purcell Police Department and asked if the department had a unit nearby that could intercept the vehicle for him. At that time, Trooper Dickens was too far away "to talk car to car." The Purcell dispatcher then informed Officer Tompkins of the situation. As Trooper Dickens traveled closer to Officer Tompkins, they were able to talk to each other directly over the

radio. After being told by Officer Tompkins that he had located the vehicle, Trooper Dickens directed Officer Tompkins "to follow the vehicle and if he found any reasons of reckless driving or possible DUI-involved violations, to go ahead and stop that vehicle until I could get there." Officer Tompkins then informed Trooper Dickens that he had stopped the vehicle between the 96– and 97–mile–marker. Trooper Dickens arrived at the scene five to ten minutes after the stop. When he arrived on the scene, he found Dahl standing behind the truck talking to Officer Tompkins. He requested Dahl's driver's license and then asked him to be seated in the patrol car. Dahl complied.

¶ 5 Trooper Dickens relayed the subsequent events as follows:

When I got back in my vehicle, I started talking to him about an incident that happened down south. And then the more I started talking to him, the more I could smell a strong odor of alcohol coming from his person. At that time, I asked him, "How much have you been drinking?" He said he'd had a couple coming back from the Texas area, I believe—or the Ardmore area.

At that time, I asked if he had any open beers in the car. He said he didn't believe that he had anything in his car, open container-wise. I said, "Well now that I can smell alcohol on you, I'm going to check." And so at that time, I did check, did find some open containers, come back to my car and told him that—you know, I need to have him do a field sobriety test to make sure we could leave here, plus I was also getting witness statements from the victim of the reckless driving that happened south of there.

At that time, I did my field sobriety tests, acknowledged to Mr. Dahl that I needed him to be required to take a breath test because I thought he was under the influence of alcohol.

Trooper Dickens then placed Dahl in custody by putting handcuffs on him and placing him in the patrol car. He took Dahl to McClain County for a breath test. The test results indicated a blood alcohol content of .11.

¶ 6 After an implied consent hearing, Dahl's license was revoked. Dahl filed a petition to set aside the order of revocation in McClain County District Court. At the hearing on the matter, State called Officer Tompkins and Trooper Dickens to testify. At the conclusion of the hearing, the trial court asked the parties to file briefs.

¶ 7 The trial court issued an order on April 30, 2001, concluding that Dahl was never validly arrested. Specifically, the court found that the "Fellow Officer Rule" did not apply because the OHP "did not observe or have any sensory or electronic perception of any violation of law that he could relate to" Officer Tompkins. The court further found that Officer Tompkins did not observe any violation of law within his jurisdiction and therefore had no probable cause to stop Dahl. The court also found that Officer Tompkins "effected an arrest when he activated his emergency lights behind [Dahl] and [Dahl] was not free to go." The court concluded that, when the arrest was effected, Officer Tompkins was outside his jurisdiction, and, further, that a citizen's arrest was neither alleged nor shown. As a result of its findings, the trial court set aside State's revocation of Dahl's driver's license. State appeals.

### STANDARD OF REVIEW

■ ¶ 8 "On appeal from orders of implied consent revocations, the appellate courts may not reverse or disturb the findings below unless the lower court's determinations are found to be erroneous as a matter of law or lacking sufficient evidentiary foundation." *Abdoo v. State ex rel. Dep't of Pub. Safety,* 1990 OK CIV APP 2, ¶ 11, 788 P.2d 1389, 1393.

### ANALYSIS

■ ¶ 9 Under Oklahoma's Implied Consent Law, a valid arrest is necessary to authorize a police officer to request submission to a chemical test for blood alcohol. *White v. Okla. Dep't of Pub. Safety,* 1980 OK 21, ¶ 6, 606 P.2d 1131, 1132. State asserts that a valid arrest occurred because (1) Officer Tompkins observed a misdemeanor sufficient to allow him to arrest Dahl pursuant to *47*

O.S.1991 § 16–114; (2) he properly stopped and detained Dahl; and (3) he was authorized to stop Dahl and detain him until Trooper Dickens arrived.

¶ 10 The primary issue in this case is whether Officer Tompkins was authorized to stop Dahl after Dahl had left Purcell. Although Dahl is correct in his assertion that an officer outside his or her jurisdiction ordinarily has no greater authority than that of an ordinary citizen, there are certain exceptions to this general rule: "1) hot pursuit; 2) when one municipality has requested the assistance of another municipality's officers; and 3) service of an arrest warrant." *Staller v. State*, 1996 OK CR 48, ¶ 10, 932 P.2d 1136, 1139 (footnotes omitted). The second exception applies here. Although the request for assistance did not involve one municipality's request for assistance from another, case law holds that a request from the OHP to an officer from a municipality may also fall under this exception.

¶ 11 In *Smith v. State*, 1982 OK CR 89, 656 P.2d 277, the chief of the OHP requested that a Tulsa police officer take over a murder investigation in Rogers County. After the Rogers County Sheriff arrived on the scene, he made a formal request for assistance from the Tulsa Police Department. The court noted that in certain emergency situations officers from one municipality, "upon request of the mayor or chief of police of any other municipality, may serve as police officers in the municipality requesting their assistance upon approval of the governing body of the municipality where such officers are regularly employed." *Id.* at ¶ 28, 656 P.2d at 284 (quoting 11 O.S.1981 § 34–103 ). The defendant asserted that the evidence obtained by the Tulsa officer should be suppressed because he was acting outside of his jurisdiction; the sheriff rather than the mayor or

chief of police requested the assistance; and the governing body of Tulsa did not give formal approval. *Id.* The Court of Criminal Appeals held that, although the statute was not explicitly complied with, the defendant failed to show that he was prejudiced by the actions of the officers so as to justify the suppression of the evidence. *Id.*

¶ 12 The facts in *Geary v. State*, 1985 OK CR 141, 709 P.2d 690, a case cited by neither party, closely resemble the facts before us. There, two police officers in Henryetta received a report of a "vehicle traveling west on the eastbound lane of Interstate 40 between the two Henryetta exits." *Id.* at ¶ 2, 709 P.2d at 692. One of the officers contacted an OHP trooper to advise him of the situation. The trooper asked the officers to "try to spot the automobile and . . . he would proceed there as soon as possible." *Id.* The officers entered the expressway and proceeded west in the westbound lane. After the officers spotted the vehicle traveling west in the eastbound lane, they engaged their sirens and red lights. The driver did not stop his vehicle for two miles after the officers initiated the siren and lights. When the driver exited the vehicle, the officers observed that he had difficulty walking and speaking and had the odor of alcohol on his breath. Because the trooper was temporarily detained, he requested that the officers take the driver to Henryetta. The driver, who was later convicted of driving under the influence, asserted that the evidence presented at his trial was a product of an illegal arrest because the officers were acting outside of their jurisdiction when they arrested him. *Id.* at ¶ 7, 709 P.2d at 692.

¶ 13 The Court of Criminal Appeals pointed out that "one municipality can request the assistance of another municipality's police officers pursuant to 11 O.S.1971 § 20.6."[1] *Id.*

**1.** This statute has since been renumbered. The current version can be found at *11 O.S. Supp. 2000 § 34–103* (B), and provides that:

Members of the regular police department of any municipality, upon request of a county sheriff or a designee, or upon request by a member of the Oklahoma Highway Patrol, may serve as law enforcement officers for the sheriff's office or the Oklahoma Highway Patrol, respectively, if such service has been authorized by prior resolution

by the governing body of the municipality where such officers are regularly employed. While so serving, such police officers shall have the same powers and duties as though employed by the requesting law enforcement agency and when so acting they shall be deemed to be acting within the scope of employment of the requesting law enforcement agency; except that salaries, insurance and other benefits shall be provided in their

at ¶8, 709 P.2d at 692–93 (quoting *Graham v. State*, 1977 OK CR 1, ¶14, 560 P.2d 200, 203). The court further noted that the same reasoning applied to the OHP by way of the Highway Safety Code, *47 O.S. Supp.1982 § 2–117.*[2] The court reasoned:

> Since a member of the State Highway Patrol has the "authority to arrest without a writ, rule, order or process any person detected by him in the act of violating any law of the state," *47 O.S. Supp.1982, § 2–117,* it therefore follows that *any officer acting upon the request of a State Highway Patrol officer has the same rights and immunities thereof.*

*Id.* at ¶8, 709 P.2d at 693 (emphasis added). The court concluded that, because the officers were acting at the request and under the direction of the trooper, they "derived the right to apprehend" the defendant from the trooper. *Id.* The current version of section 2–117(2) still provides that an officer acting upon the request of a member of the OHP acquires the rights and immunities of the OHP. This includes the right to make a stop for purposes of an investigative detention.

 ¶14 In accordance with *Geary,* we find that Officer Tompkins was acting upon the direction and request of the OHP, and, therefore, derived the right to stop Dahl for the benefit of the OHP. In the course of this valid stop, Trooper Dickens made personal observations which, together with information previously communicated to him by Officer Tompkins in the course of assisting Trooper Dickens, furnished sufficient probable cause to arrest Dahl for DUI. As a result, we find the trial court erred in concluding that Dahl was not validly arrested. Having so concluded, we find it unnecessary to address State's remaining arguments. Accordingly, we reverse the decision of the trial court.

¶15 REVERSED.

¶16 REIF, V.C.J., and GOODMAN, P.J., concur.

---

regular manner by the municipality in which the police officers are regularly employed.

**2.** Title *47 O.S. Supp.1982 § 2–117* (2) provided the following:

This section shall not limit a member of the Oklahoma Highway Patrol Division from requesting assistance from any other law enforcement agency nor limit officers of such agency from rendering the requested assistance. The officer and the law enforcement agency responding to the request of the member of the Oklahoma Highway Patrol Division or sheriff's department shall have the same rights and immunities as are possessed by the Oklahoma Highway Patrol Division.